**TOBIN, Secretary, Department of Labor, v.
ALSTATE CONST. CO.**

Civ. No. 3189.

United States District Court
M. D. Pennsylvania.
Feb. 23, 1951.

William S. Tyson, Solicitor, Jeter S. Ray, Associate Solicitor, and John J. Babe, Assistant Solicitor, U. S. Department of Labor, all of Washington, D. C., Ernest N. Votaw, Regional Atty., Louis Weiner, Senior Atty., U. S. Department of Labor, Philadelphia, Pa., Arthur A. Maguire, U. S. Atty., Scranton, Pa., for plaintiff.

McNees, Wallace & Nurick, Harrisburg, Pa., for defendant.

FOLLMER, District Judge.

This action was brought by William R. McComb, Administrator of the Wage and Hour Division, United States Department of Labor, plaintiff, under the Fair Labor Standards Act of 1938, Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. § 201, et seq. to enjoin defendant, Alstate Construction Company, a Pennsylvania corporation, from violating the provisions of Sections 15(a)(2) and 15(a)(5) of the Act, 29 U.S.C.A. § 215(a)(2, 5). Subsequently, by Stipulation, Maurice J. Tobin, Secretary of the United States Department of Labor, was substituted as party plaintiff.

The facts of the case are contained in a Stipulation and Supplemental Stipulations

of Facts, further supplemented by certain additional testimony taken in open court by the plaintiff, all of which may be summarized and condensed as follows:.

Defendant is engaged in the production, sale, distribution and further application of a bituminous concrete material, known as amesite. Its operations are wholly in Pennsylvania, where its material is processed at its three separate plants, namely, Hanover in Adams County, Cressona in Schuylkill County, and Naginey in Mifflin County.

Amesite consists of the following ingredients, limestone, naptha, asphalt filler and lime, all of which is quarried or manufactured and purchased in Pennsylvania with the exception that about eight thousand gallons of asphalt are received from a refinery in Baltimore, Maryland, and pumped from railroad tank cars into defendant's storage tanks each week at the Hanover plant. The operation of receiving, handling and pumping the asphalt takes from four to five hours and is performed by any employee available at the time.

The said bituminous concrete materials, known also as HE, a cold mix, and ID2, a hot mix, otherwise known as macadam blacktop, are primarily marketed by defendant as follows:

(1) Contracts with the Commonwealth of Pennsylvania and many of its political subdivisions, for the sale of material and for material and labor for constructing, reconstructing, resurfacing or repairing highways, roads, and streets connecting with such highways, all of which are accessible to and regularly used by general vehicular traffic, including traffic moving between points in Pennsylvania and points in other states.

(2) Contracts with interstate railroad companies, commercial and industrial firms engaged in the production of goods for commerce for sale of material and for material and labor to be used in the construction, reconstruction, repair or maintenance of roads, railroad crossings, parking areas and other facilities of such firms.

(3) Contracts with private persons and others having no interstate activity and not engaged in interstate commerce or the production of goods for commerce, for sale of material and for material and labor to be used in construction, reconstruction, repair and maintenance of road surface.

The period covered by the inspection was from June 30, 1945, through June 30, 1948. For this period the total volume of business done by defendant was $1,172,276.70, as follows:

Cressona Plant, Total volume $643,334.84 distributed as follows:

Pennsylvania Department of

| | | |
|---|---|---|
| Highways | 53.96% or | $347,177.55 |
| Townships | 9.99% or | 64,327.68 |
| Boroughs | 3.32% or | 21,362.45 |
| Industrial | 13.23% or | 85,135.69 |
| Railroads | 2.20% or | 14,154.80 |
| Private | 17.28% or | 111,176.67. |

Naginey Plant, Total volume $237,991.99 distributed as follows:

Pennsylvania Department of

| | | |
|---|---|---|
| Highways | 33.25% or | $79,154.63 |
| Townships | 9.76% or | 23,232.06 |
| Boroughs | 22.56% or | 53,710.41 |
| Industrial | 13.79% or | 32,834.43 |
| Railroads | .92% or | 2,205.75 |
| Private | 19.68% or | 46,854.71. |

Hanover Plant, Total volume $290,949.87 distributed as follows:

Pennsylvania Department of

| | | |
|---|---|---|
| Highways | 76.95% or | $223,904.12 |
| Townships | 1.12% or | 3,284.06 |
| Boroughs | 3.04% or | 8,872.97 |
| Industrial | 13.29% or | 38,692.18 |
| Railroads | 1.56% or | 4,566.62 |
| Private | 3.99% or | 11,629.92. |

Defendant employs various classes of employees in its three plants and main office, including plant foremen, field foremen, equipment operators, laborers, semiskilled laborers, truck drivers, mixers, firemen, watchmen, and clerks. Equipment operators are engaged in operating such equipment as spreaders, graders, pavers, shovels, and rollers at times used directly in the work of constructing, repairing, or reconstructing the said highways and roads. Truck drivers are engaged in the following activities:

(1) Haul stone from the Bethlehem, Pennsylvania, quarry to the Hanover plant for use in the production of bituminous concrete materials.

(2) Haul the bituminous concrete materials from the company's Naginey and Cressona plants to the job site.

(3) Haul the bituminous concrete materials from the company's Naginey and Cressona plants to the job sites where the material is dumped into spreaders or pavers on the highway for application thereon.

(4) At the Hanover plant the defendant's truck drivers do some hauling of the bituminous concrete materials from the plant to the job site. Pennsylvania Department of Highways, in some instances, has accepted bids for the said material F.O.B. plant, in which event the material is hauled from the plant to the job site in Pennsylvania Highway Department trucks. For the most part, however, the trucking is performed by contract haulers, hauling from the plant to the job site, at an agreed price per ton, which is paid by the defendant.

Laborers and semi-skilled laborers rake amesite on the highways, spread stone base and perform pick and shovel work on roads. At the plants off-the-road employees, including mixers, firemen, watchmen, and clerks, are engaged in, or perform work incident to, the production of bituminous concrete materials.

Most of the employees of the defendant of the classes above described are regularly employed in excess of forty hours per week without payment of extra compensation at time and one-half of their regular rate for such overtime hours. Wages are paid throughout the year to many of defendant's employees, including months during which defendant's plants do not operate and the employees do not work.

Prior to January 1, 1948, defendant, at its main office and each of its plants, failed to keep proper records as required by Title 29, Chapter V, Code of Federal Regulations, Part 516. Since January 1, 1948, defendant has kept records showing occupation, day and time of beginning of work week, number of hours worked each day, and number of hours worked each week.

There is no segregation of work performed by truck drivers at the Cressona or Naginey plants in the hauling of road mix produced at these plants for use on existing highways, public roads and streets from other hauling work performed by them; nor is there any segregation of work performed by the so-called off-the-road employees employed at the company's three plants engaged in the production of road mix for use on existing highways, public roads and streets from other uses for which the road mix is produced.

Plaintiff contends that employees of the defendant actually engaged in the construction, repair, reconstruction, extension and maintenance of interstate highways, public roads and interstate railroads which are regularly used for interstate transportation are engaged "in commerce" within the meaning of the Fair Labor Standards Act of 1938; also, that employees engaged in manufacturing and hauling road mixes produced at defendant's plants for use on interstate highways are engaged "in the production of goods for commerce"; also, that truck drivers who haul raw materials or ingredients to defendant's plants producing road mixes for use on interstate highways are engaged "in the production of goods for commerce".

Defendant, while admitting that its employees actually working on the highway or other instrumentality of interstate commerce itself, applying amesite in the repair or maintenance thereof as distinguished from original construction, are within the protection of the Fair Labor Standards Act, contends that its employees engaged in the construction of new highways and its off-the-road employees do not have such immediacy of participancy in interstate commerce as to bring them within the coverage of the said Act.

The parties are not in agreement as to what constitutes new construction in relation to road building. Plaintiff insists upon the ultimate, i.e., new means the construction of a road on a location in which no previous road existed; defendant contends that it includes the complete remaking of an old road bed, which almost always includes the use of a substantial part of the original location but also involves the straightening of curves and the elimina-

tion of hills which would necessarily cover some virgin road territory.

The function of the court in this situation is clearly pointed out by Justice Frankfurter in A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 523, 524, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638.

"* * * the scope of the Act is not coextensive with the limits of the power of Congress over commerce, * * *. * * * the Fair Labor Standards Act puts upon the courts the independent responsibility of applying ad hoc the general terms of the statute to an infinite variety of complicated industrial situations. * * *

"* * * the provisions of the Act expressly make its application dependant upon the character of the employees' activities. * * *"

In Overstreet v. North Shore Corp., 318 U.S. 125, 128, 63 S.Ct. 494, 496, 87 L.Ed. 656, the court said: "* * * And in determining what constitutes 'commerce' or 'engaged in commerce' we are guided by practical considerations."

Again in 10 East 40th Street Building, Inc. v. Callus, 325 U.S. 578, 582, 65 S.Ct. 1227, 1228, 1229, 89 L.Ed. 1806, 161 A.L.R. 1263, Justice Frankfurter said: "* * * For as was pointed out in Walling v. Jacksonville Paper Co., supra, 317 U.S. [564] at page 570, 63 S.Ct. [332] 336, 87 L. Ed. 460, we cannot 'be unmindful that Congress in enacting this statute plainly indicated its purpose to leave local business to the protection of the states.' We must be alert, therefore, not to absorb by adjudication essentially local activities that Congress did not see fit to take over by legislation."

 Original construction is definitely beyond the contemplation of the Act.[1] But what is original construction? As indicated above, plaintiff insists upon the ultimate, i. e., the construction of a road where no road has previously existed. Defendant contends that any resurfacing of an old road bed is new or original construction. In the Kirschbaum case, supra, 316 U.S. 517, 520, 62 S.Ct. 1118, Justice

Frankfurter aptly phrased the inherent difficulty in properly applying the provisions of the Act to the average industrial enterprise as follows: "To search for a dependable touchstone by which to determine whether employees are 'engaged in commerce or in the production of goods for commerce' is as rewarding as an attempt to square the circle. * * *"

However, in attempting to determine what constitutes "commerce" or "engaged in commerce" we are cautioned that we are to be guided by practical considerations.

This defendant, according to the Stipulations, makes, distributes and applies its road material, amesite; its road work, covered by contracts with the Commonwealth of Pennsylvania and many of its political subdivisions, involved no completely original construction, it consisted entirely in some form of resurfacing of previously existing roads, either interstate as such or connecting with an interstate system, with the slight exception involved in the straightening of old road lines; its industrial and railroad work was in each cited instance done for the improvement of the facilities of concerns engaged in interstate commerce; its private work comprised about fourteen and one-half per cent. of its overall total and apparently involved no interstate activity. Furthermore, at none of its plants was there any segregation of work performed by its off-the-road employees who were engaged in work having definite interstate involvements from those of a purely private nature.

Starting with the premise that approximately eighty-five and one-half per cent. of its total volume of work for the period in question involved interstate facilities, the sole question remaining is—Was it or was it not original construction? A typical case would be a through highway carrying a State and frequently a United States highway number. It may originally have been dirt, but it was none the less a part of an interstate system of highways. Just what sort of treatment would the defendant have us designate original construction on that old road bed? What

1. Kelly v. Ford, Bacon & Davis, Inc., 3. Cir., 162 F.2d 555, 561.

difference does it make whether the old dirt road bed has simply been oiled, stoned and oiled, cemented or amesited? It is still the improvement of a previously existing interstate highway.

In Walling v. McCrady Const. Co., D.C.W.D.Pa. 60 F.Supp. 243, 248, affirmed 3 Cir., 156 F.2d 932, the court, in my judgment, correctly analyzed this road situation as follows: "* * * In most of the highways involved in this case, where defendant claims the work was new,—even though the road follows the old—it relies on the magnitude of the work, notwithstanding the work was on the old road. In such cases there is no doubt that the work done by defendant was repair or reconstruction of an instrumentality of interstate commerce. In some instances, parts of the highway were relocated following the general location of the old highway, and served the same purpose. In those cases we are of the opinion the work done by the employees falls squarely within the Act. In such instances, the work done was clearly to improve portions of a highway that was used in interstate commerce."

■ I am of the opinion that the various plants of the defendant were all component parts of an integrated unit, eighty-five and one-half per cent. of whose total output was directed toward the improvement of various interstate facilities, and that all of the employees of the defendant are definitely within the scope of the statute. As interpreted by the Supreme Court in Overstreet v. North Shore Corp., 318 U.S. 125, 129, 63 S.Ct. 497, "We think that practical test should govern here. Vehicular roads and bridges are as indispensable to the interstate movement of persons and goods as railroad tracks and bridges are to interstate transportation by rail. If they are used by persons and goods passing between the various States, they are instrumentalities of interstate commerce. Cf. Covington & Cincinnati Bridge Co. v. Kentucky, 154 U.S. 204, 218, 14 S.Ct. 1087, 1092, 38 L.Ed. 962. Those persons who are engaged in maintaining and repairing such facilities should be considered as 'engaged in commerce' even as was the bolt-carrying employee in the Pedersen case, supra, because without their services these instrumentalities would not be open to the passage of goods and persons across state lines. And the same is true of operational employees whose work is just as closely related to the interstate movement. * * * "

■ My conclusion is, therefore, on the whole of the transactions involved in this case, that the plaintiff is entitled to an injunction, as prayed for.

An order for judgment in accordance herewith may be submitted on notice to opposing counsel.