James P. MITCHELL, Secretary of Labor, United States Department of Labor,

v.

EMALA & ASSOCIATES, INC.

Civ. No. 10803.

United States District Court
District of Maryland.

March 24, 1959.

Morton I. Schwartzman, Stuart Rothman, Washington, D. C., Ernest N. Votaw, United States Department of Labor, Chambersburg, Pa., for plaintiff.

Leonard A. Vadala, C. Victor McFarland, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

This is a suit brought by the Secretary of Labor under the provisions of the Fair Labor Standards Act (section 216(c) of Title 29 U.S.C.A.) to recover, on behalf of one former employee of the defendant, unpaid overtime compensation alleged in the complaint to be due for each work week during the period from October 22, 1956 to February 26, 1957, in the amount of $107.89 [1].

The facts are not in dispute. The defendant is a general contractor engaged mainly in the sale of sod, top-soil, and fill dirt. The contract of sale herein involved provided that the defendant would "furnish and place approximately 39,000 cubic yards of fill dirt at sixty-five cents per cubic yard." The defendant owned the borrow pit. The dirt was measured at the borrow bed, loaded on defendant's trucks and delivered to the site indicated by the purchaser. In order for more dirt to be delivered, it was necessary that a bulldozer be used to level the dirt for the passage of oncoming delivering trucks. The defendant did not set the grades nor contract to do grading work. The employee in question, James L. Presson, was engaged for the first part of the time herein involved as a truck driver hauling fill dirt from Rolling Road to a fill site on a nearby section of the Baltimore County Beltway where he dumped the dirt. Subsequently, he operated a bulldozer leveling off loads of dirt dumped by other drivers from defendant's trucks at the same fill to permit the delivery of more dirt, and later for the same purpose operated a bulldozer leveling off loads of dirt dumped at the approaches to abutments of the Golden Ring Bridge being built on the Pulaski Highway. When testifying, the employee characterized his work in leveling the fill dirt as "prime grading", although he admitted that this was the first prime grading that he had ever done; that he couldn't read grade sheets; but that he leveled to stakes on the slopes.

Upon these facts the plaintiff contends "that insofar as Mr. Presson was hauling dirt to be used as fill on the highway projects, he was engaged in the production of goods for interstate commerce and insofar as he was dumping the dirt at the highway project or leveling or spreading it, he was engaged in the highway construction, and hence in interstate commerce,"[2] and "that the evidence pro-

---

[1] Actually it appears from the schedules in plaintiff's answers to defendant's interrogatories that the claim for $107.89 plus interest in the amount of $12.68 relates to the period from August 28, 1956 through February 26, 1957 and that, as it is not contended that the employee's duties were the same each week so as to bring him within the coverage of the Fair Labor Standards Act each work week during the period, a claim of protection under the Act and for overtime compensation is being asserted for only 13 weeks out of the total 27 week period.

[2] Plaintiff's reply brief, p. 1.

duced clearly indicates that Mr. Presson was engaged in commerce *as well as possibly in the production of goods for commerce.*"[3] (Emphasis supplied.) Defendant is equally positive that the sale of an unprocessed material, such as dirt, which due to its weight and the fact that it is so readily obtainable makes its transportation over any appreciable distance commercially impractical and thereby confines the supplying of it to an essentially local business, is not within the purview of the Fair Labor Standards Act even although the dirt is used on a facility covered under the Act and although it is delivered to the construction site by the defendant. Defendant summarizes its position as follows:

"Dirt standing at the borrow pit has no commercial value but only after it has been delivered to the construction site at the proper location. If placed at the wrong location, it becomes worthless and of no more value than any other dirt at the same location. Since it is created (produced) by nature, delivered by the Defendant's employee, it was later to be shaped and graded under other contracts to be performed after the period of the [claimant's] employment. The dirt is not in shape for its intended use until the process of grading is done. The question raised in this case is this— If sod, top soil, or dirt suppliers, who supply their product of nature for construction to instrumentalities of, or industry involved in, interstate commerce for only a small portion of their business, come under the Act, then where does its coverage stop?"

The defendant's statement of the issue involved is in tenor, and factually, quite similar to Mr. Justice Douglas's dissent, with which Mr. Justice Frankfurter concurred, in Alstate Construction Co. v. Durkin, 1953, 345 U.S. 13, 17, 73 S.Ct. 565, 568, 97 L.Ed. 745:

"The Court reasons that if the man who is building or repairing an interstate highway is 'engaged in commerce', the one who carries cement and gravel to him from a nearby pit is 'engaged in the production of goods for commerce.' Yet if that is true, how about the men who produce the tools for those who carry the cement and gravel or those who furnish the materials to make the tools used in producing the cement and gravel? Each would be essential to the highway worker 'engaged in commerce.' Yet the circle gets amazingly large once we say that 'the production of goods for commerce' includes the 'production of goods for those engaged in commerce.'"

In the instant case, as there is no factual dispute, whether or not the duties of the particular employee in question bring him within the coverage of the Fair Labor Standards Act is a matter of law. The problem facing the court, however, is whether or not the issue of law so presented has been "settled finally by the courts", for section 216(c) of Title 29 provides, in part, as follows:

"* * * When a written request is filed by any employee with the Secretary of Labor claiming unpaid minimum wages or unpaid overtime compensation under section 206 or section 207 of this title, the Secretary of Labor may bring an action in any court of competent jurisdiction to recover the amount of such claim: *Provided, That this authority to sue shall not be used by the Secretary of Labor in any case involving an issue of law which has not been settled finally by the courts, and in any such case no court shall have jurisdiction over such action or proceeding initiated or brought by the Secretary of Labor if it does involve any issue of law not so finally settled.* * * *" (Emphasis supplied.)

In the House Conference Report (H. Rept. No. 1453), 95 Cong.Rec., at page

---

3. Plaintiff's reply brief, p. 4.

14934, the conference agreement in discussing this section of the Act, states:

"The conference agreement adds a proviso to prevent the Administrator from using the authority granted in this section to bring test cases involving new or novel questions of law. The Administrator may use his authority under this section to bring a suit for an employee only in cases where the law has been settled finally by the Courts. *The proviso is not intended, however, to preclude the Administrator from instituting suits or the Court from taking jurisdiction on the basis of existing legal precedents under the Fair Labor Standards Act of 1938, as amended,* except to the extent that they are changed by the amendments made by the conference agreement." (Emphasis supplied.)

The Senate Conference Report contains language to the same effect. See 95 Cong. Rec., page 14879, October 18, 1949.

The question of whether or not the issue of coverage as raised in this case involves an issue of law which has not been settled finally by the courts, that is an issue not settled on the basis of existing legal precedents, thus is jurisdictional in nature. This was recognized, although in slightly different language, in Chief Judge Timmerman's ruling in Mitchell v. Columbia Air-O-Blind Company, D.C. S.C.1955, 132 F.Supp. 553, 554 where he said:

"It was the intention of Congress that the Administrator should have general authority to institute suits to recover employees' claims in any Court of competent jurisdiction, but if it should appear during the course of any such suit that the Administrator has used the authority granted him for the purpose of testing a novel question of law, then the proviso should operate to divest the Court of its jurisdiction. One claim-

ing the benefit of a proviso following a general clause in a statute has the burden of showing that the proviso is applicable."

The problem being one of jurisdiction, the applicability of the proviso even if not raised by the defendant employer must, if the circumstances require it, be raised and considered by the court sua sponte.

Both sides in the instant case are completely in accord that this court is not being called upon to decide any new or novel question of law.[4] To substantiate their diametrically opposed legal positions as to coverage under the Act, four memoranda have been submitted by the parties. Admittedly no one case is cited by either side as being directly on point.

The plaintiff takes the position that to hold that in every case, before a section 216(c) suit may be filed, there must be a pre-existing judicial precedent squarely in point with the facts in controversy before this Court would virtually nullify the salutary provisions of section 216(c) for the recovery of unpaid compensation without expense to the claimant. While the court agrees that it would be unreasonable to require, or even expect, that a single case directly on "all fours" with the present facts be cited, it does appear that if this case does not involve "new or novel questions of law", authority or authorities should be cited by plaintiff showing that all legal issues have "been settled finally by the courts" prior to the institution of this suit.

The recent reversal of the Court of Appeals for the Fourth Circuit by the Supreme Court in Mitchell v. Lublin, McGaughy & Associates, 1959, 358 U.S. 207, 79 S.Ct. 260, 264, 3 L.Ed.2d 243, indicates the importance and significance of each type of activity which combines to produce the end product:

"Where employees' activities have related to interstate instrumental-

---

4. In Chicken v. Ham, A. P. Herbert, Uncommon Law, p. 71, all five Law Lords agreed that "The law is clear", two, however, holding the publication to be libel, two holding it to be slander, and the fifth dying before he could explain which way the law was clear.

ities or facilities, such as bridges, canals and roads, we have used a practical test to determine whether they are 'engaged in commerce.' The test is 'whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity.' Mitchell v. C. W. Vollmer & Co., supra, 349 U.S. [427] at page 429, 75 S.Ct. [860] at page 862 [99 L.Ed. 1196]. Coverage in the instant case must be determined by that test for, as the parties stipulated below, the draftsmen, fieldmen, clerks and stenographers all worked intimately with the plans and specifications prepared by respondent for the repair and construction of various interstate instrumentalities and facilities including air bases, roads, turnpikes, bus terminals, and radio and television installations. In our view, such work is directly and vitally related to the functioning of these facilities because, without the preparation of plans for guidance, the construction could not be effected and the facilities could not function as planned. In our modern technologically oriented society, the elements which combine to produce a final product are diffuse and variegated. Deciding whether any one element is so directly related to the end product as to be considered vital is sometimes a difficult problem."

Just as the difficult legal determination of what constitutes "engaging in commerce" requires a fact by fact analysis of the type of activity involved, so does the equally difficult determination of what constitutes "engaging in the production of goods for commerce". Congress has specifically stated that legal determinations of the significance of such facts are not to be made for the first time in a section 216(c) suit. The inherent weakness of the plaintiff's position in the present case—that the law is well settled—is evidenced not only by the number of memoranda submitted, none of which contained judicial precedents concerning any one of a number of factual elements claimed by the defendant to be controlling, but also by the plaintiff's own admission "that the evidence produced clearly indicates that Mr. Presson was engaged in commerce *as well as possibly in the production of goods for commerce.*" [5] (Emphasis supplied.)

Without intending to indicate in any way what the court's attitude toward, or ruling on, the facts in a section 216(b) or section 217 suit might be, the court finds that the following factual distinctions between the instant case and the cited adjudicated cases have been raised in good faith by the defendant; are not frivolous or obviously without merit; and have not been met nor answered by the plaintiff with cited legal precedent.

1. The cases covering producers of sand, gravel, asphalt, cement, crushed rock, etc. do not give any indication as to what an appellate court's attitude would be if unprocessed dirt only were supplied. By its very nature, it is not mined because it does not run in veins as sand, etc., needs no processing, i. e., crushing rock for gravel; nor washing as some sands.

2. In the Alstate Construction Company Cases, D.C.Pa.1951, 95 F.Supp. 585, 586, affirmed 3 Cir., 1952, 195 F.2d 577 and affirmed, 1953, 345 U.S. 13, 73 S.Ct. 565, 97 L.Ed. 745, a man-made material was produced, amesite, which consisted of the following ingredients, limestone, naptha, asphalt filler (coming from out of state) and lime, and its sole use was to surface roads upon which interstate traffic moved. The defendant employer was engaged in "the production, sale, distribution and *further application* of a bituminous concrete material, known as amesite", its contracts calling for "material and *labor for constructing, reconstructing, resurfacing or repairing* highways, roads, and streets" (Emphasis sup-

5. Plaintiff's reply brief, p. 4.

plied) regularly used for interstate transportation (Tobin v. Alstate Construction Co., supra, 95 F.Supp. 585, 586) while in the instant case the defendant's contract merely called for the supplying of dirt, a raw material which to be saleable must be delivered and placed at the proper location and on occasion leveled off. Processing products necessary to the surfacing of instrumentalities of interstate commerce, and the repair and surfacing thereof by such processor, are distinguishable from merely supplying to those engaged in construction raw, natural substances which have many other uses.

3. The sale of dirt, by the very nature of the material, must, to be commercially successful, be confined to a local operation and thus coverage under the Act, defendant argues, does not extend to defendant's employees according to the provisions of plaintiff's own Interpretive Bulletin, July 31, 1958 (29 CFR, 1958 Supp., section 776.27, [d] [3] and [4]):

"(d) Production of materials for use in construction work on interstate instrumentalities.

\*   \*   \*   \*   \*   \*

"(3) Coverage also extends to employees who produce sand, gravel, asphalt, cement, crushed rock, railroad ties, pipes, conduits, wires, concrete pilings and other materials which are to be used in the construction of instrumentalities which serve as the means for the interstate movement of goods or persons.

"(4) This does not mean, however, that in every case where employees produce such materials which are used within the State in the maintenance, repair, or reconstruction of an instrumentality of commerce, the production of such materials is necessarily considered as production 'for' commerce. A material supply company may be engaged in an independent business which is essentially local in nature,

selling its materials to the usual miscellany of local customers without any particular intent or purpose of supplying materials for the maintenance, repair, or reconstruction of instrumentalities of commerce, and without any substantial portion of its business being directed to such specific uses. Employees of such an 'essentially local business' are not covered by the act merely because as an incident to its essentially local business, the company, on occasion, happens to produce or supply some materials which are used within the State to meet the needs of instrumentalities of commerce."

In an attempt to interpret[6] its own Interpretative Bulletin the plaintiff states:

"\*   \*   \* Section 776.27(d) does apply to the furnishing of materials for use in construction work on instrumentalities of interstate commerce. It, however, applies only to those furnishing materials to others who use them in the construction of highways, etc., and *is not applicable to those who actually place the material on the highways, and hence, actually engage in their construction.*" (Emphasis supplied.)

This attempted construction only emphasizes one of the issues of law that this court is being requested to decide without the help of existing legal precedent on this exact and specific point; namely, do employees of suppliers of materials who would otherwise be excluded from the coverage of the Act by delivery of the materials direct to the construction site thereby so actively participate at the project site as to be considered as actually engaging in the construction of an instrumentality of interstate commerce?

For the foregoing reasons this court holds that it is without jurisdiction over the present suit and, accordingly, the bill of complaint is hereby dismissed.

6. Reminiscent of the popular song: "Who Takes Care of the Caretaker's Daughter when the Caretaker's not Taking Care?"