(C. D. 1419)

ITALERICA CORPORATION *v.* UNITED STATES

United States Customs Court, Third Division

*John C. Ray* for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Samuel D. Spector* and *Richard H. Welsh*, special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

EKWALL, Judge: This case involves an importation of what is described on the invoice as "208 cases containing each 24 bottles of 'Aleatico' wine," imported from Italy and entered at the port of Detroit, Mich. The collector of customs assessed duty thereon at the appropriate rate under paragraph 804 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 804). The wine was also assessed with an internal revenue tax of 15 cents on each half pint under title 26 U. S. C. § 3030 (a) (2), as amended by section 1650, as sparkling wine. The legality of the assessment of regular customs duty under the tariff act is not in dispute, plaintiff's claim being limited to the allegation that the wine is a still wine, properly assessable with internal revenue tax at the rate of 15 cents per wine gallon under 26 U. S. C. § 3030 (a) (1), as amended, *supra*. The official papers indicate that the basis of the assessment of the internal revenue tax is a holding of the Bureau of Internal Revenue that certain petillant or crackling wines having only a minor effervescence are subject to the rate applicable to sparkling wine or artificially carbonated wine, although customs duties are assessed thereon at the rate applicable to still wine. (T. D. 51193 (4).)

Title 26, section 178.5 (d) and (w), 1945 Supplement to the Code of Federal Regulations (in effect at the time of this importation), gives the following definitions:

(d) "Champagne" and "sparkling wine" shall mean effervescent wine charged with carbon dioxide, resulting from fermentation of the wine within a closed container.

(w) "Still wine" shall mean noneffervescent wine.

In support of its claim that the merchandise is a still wine, plaintiff introduced the testimony of three witnesses, a former general manager of the plaintiff corporation; the manager of a well-known restaurant in Detroit, Mich., who had had 42 years' experience as a waiter; and a wine merchant with long years of experience. The Government produced two witnesses, one the assistant chief chemist of the United States Customs Laboratory at the port of Chicago, who had had long experience in such work, and the other a Government examiner at the port of Detroit, who had held that position since 1941.

From the testimony of Mr. Maglia, formerly the general manager of the plaintiff corporation, it developed that while this wine in suit was still in bonded warehouse, he was informed that some of the bottles were broken and that subsequently, in the office of the customs examiner, he saw two cases, one of which had been opened, disclosing that several bottles were empty and one or two were broken. He was informed by the customs examiner that under the regulations the customs officials were required to send a typical bottle to Chicago for analysis. The witness testified that when the cases were opened by him for the purpose of labeling the bottles, it was found that some bottles were broken, some broke when the case was opened, but at that time, he was unaware of the cause of the breakage. Out of about 300 cases, plaintiff salvaged about 179. Because of the requirement of the state law that every bottle must be labeled before removal from bonded warehouse, it was necessary to open every case and handle every bottle. At that time, he affixed tops to the bottles similar to the metal tops tied with a wire used upon champagne bottles. This was done in order to prevent the corks from becoming detached causing the spoilage of the wine or breakage. After repacking the bottles and selling the wine, only 30 or 40 cases out of a lot of approximately 179 cases "stayed sold," that is, were not returned. When the buyers opened the cases, they found additional bottles breaking and some of the wine spoiled. The witness further stated that he sold this wine, when salvaged, as a still wine.

Upon cross-examination, the witness stated that he had analyses made of two bottles of the imported wine by the Detroit Testing Laboratories, at different times.

The second witness for the plaintiff, Mr. Albert Romain, a manager of a restaurant, with 42 years' experience as a waiter in some of the best-known hotels in England, on the Continent, and in Canada, besides the United States, testified as to the nature of Aleatico wine and the particular brand here involved. His testimony was to the effect that Aleatico wine is a still wine and not a sparkling wine; that he would not serve a wine that effervesced when poured, as an Aleatico wine, because he would not consider it Aleatico wine. This witness' testimony was devoted to denying that Aleatico wine could be a sparkling wine. He did not think, based upon his long experience with wines, that there was such a thing as a sparkling Aleatico wine.

Mr. Alfred J. Hammer, plaintiff's third witness, was a wine merchant, engaged in both selling and importing wines. He was familiar with Aleatico wine. His definition of a still wine is one that has no effervescence, whereas a sparkling wine has effervescence. He described the methods of producing a sparkling wine. When shown illustrative exhibit 1, a bottle of wine from the instant importation, he testified that sparkling wine is put up in bottles with five times the weight and

strength of the bottle in evidence; that such a type bottle as illustrative exhibit 1 would be a still wine bottle. As to illustrative exhibit 2, also from this importation, the witness said that the cork, judging from the exterior portion which was visible, did not "look good"; that he would have to see the whole cork to judge its condition; that when the instant wine was bottled, there were many inferior corks; that it was impossible to buy good cork. He stated that he had never heard of a sparkling Aleatico wine and that he did not think there was such a thing. If Aleatico wine was bubbling or effervescent, he would not consider it as Aleatico wine; that it would not be fit to drink if it was going through a second fermentation; that the only way in which a sparkle would be present would be through a second fermentation; that he would not attempt to sell such a wine to anyone. The witness stated that upon the facts as here presented in connection with the instant importation it seemed to him that this wine was improperly aged when shipped and that, assuming a second fermentation had taken place in the bottles, such a wine would not be classed as a sparkling wine by any wine man, and he, himself, would not accept a shipment if the corks looked like that in illustrative exhibit 2; that the condition of the cork would indicate that there was something wrong with the contents of the bottle.

It was this witness' statement that Aleatico wine which was sparkling or effervescent is undrinkable and that it would not be salable. He stated that he had dealt in Aleatico wine as a still wine, and if he received a shipment of Aleatico wine that sparkled when opened, it would indicate to him that it was not a true Aleatico but that it was spoiled and not fit to drink. Further, that wine, of which illustrative exhibits 1, 2, and 3 are representative, containing 12.7 per centum alcohol by volume, with a volume of contents of 24.25 fluid ounces, containing an amount of carbon dioxide gas dissolving under pressure of 2.4 volumes in excess of that normally found soluble under atmospheric pressure and effervescent to the extent that it foamed over the top of the bottle when opened, would have the symptoms of a sparkling wine, but is not a true sparkling wine because "It is going through a second fermentation and will settle itself down to a still wine as soon as it gets through with it." It would be a spoiled wine. That if he did not know the brand of illustrative exhibits 1, 2, and 3 and the bottles were unlabeled, when he poured it out, saw the color of the wine, tasted the degree of sweetness, and the wine sparkled, he would allow it to remain in the glass about 5 minutes, and if it went flat, he would know that there was something wrong with the wine, but if it bubbled after 10 minutes, it would be a sparkling wine. On redirect, in answer to a question, he testified that in his opinion any sparkle from such an Aleatico wine as here involved would not last more than 2 or 3 minutes.

The Government witness, Dr. Foster K. Ballard, assistant chief chemist at the United States Customs Laboratory at Chicago, with long experience as a chemist and chemist-examiner, identified the two reports of chemical analyses in evidence as exhibits 4 and 5. In connection with exhibit 5, which states that the bottle of wine analyzed contains an amount of carbon dioxide gas dissolved under pressure amounting to 2.4 volumes in excess of that normally soluble under atmospheric pressure, he testified that very little carbon dioxide is present in still wine and that the presence of 2.4 volumes in the present importation indicates that it is charged with carbon dioxide and that it is an effervescent wine and probably a sparkling wine. When it was called to this witness' attention that this wine in suit effervesced to the extent that it foamed over the top of the bottle when opened, he stated that is not a normal reaction of still wine. When asked what he considers a sparkling wine, the witness said that a sparkling wine is an effervescent wine charged with carbon dioxide resulting from the fermentation of the wine within a closed container. In the opinion of the witness, this wine is a sparkling wine.

On cross-examination, the witness stated that the presence of yeast in the samples analyzed indicated that fermentation probably took place in the bottle. He had never heard of sparkling Aleatico wine, but he did not consider himself an expert on Aleatico wine. If a still wine effervesces, it is not a still wine. When asked the difference between a petillant wine and a sparkling wine, he stated that a petillant wine is a mildly sparkling wine that does not have much effervescence and would not overflow when the bottle is opened. The length of time during which effervescence should remain in a sparkling wine after being poured would depend, in this witness' opinion, upon the conditions under which it was poured; if the room were warm, the effervescence might disappear fairly rapidly; if the wine remained cold, it would probably effervesce for about 10 minutes. It was this witness' statement that sparkling wine is not usually put up in bottles such as illustrative exhibit 1 because the pressure is generally too great for the bottle to withstand it. The witness testified that the reason that he reported the instant importation as sparkling wine was that he found some petillancy and carbon dioxide content and that it still contained alcohol, that is, if it had turned to vinegar, it would no longer be a wine. He checked his determination that this was a sparkling wine against the pressure of other sparkling wines, such as sparkling burgundy, and against a so-called petillant wine—also called crackling wine—that had practically no gas pressure, and further tested against a Portuguese wine, the name of which he did not recall. The alcoholic content of the instant wine, 12.7 per centum, is a normal figure.

Mr. Raymond C. Kurtz, the Government examiner at the port of Detroit, who examined the instant importation, was called by the Government. He stated that he examined two bottles in the warehouse which were out of the second case. Both were effervescent. This examination was made in Mr. Maglia's presence. The contents of one of the bottles examined overflowed, and the other had a crackling, bubbling sound such as is attributable to a crackling wine or sparkling wine. The contents of the second bottle which he opened crackled or bubbled for approximately 15 minutes. He tasted the contents and found them not unpalatable, with a slightly sweet taste and a tang that would attach to a champagne type, a sparkling type wine—a carbonation effect found in a charged wine. In both samples sent by him to Chicago for analyses, the corks had not broken the metal foil top and were normal. When bottles of wine are shipped to Chicago for analyses by his office, they are protected against breakage but are not packed in dry ice. So far as this witness knew, there is no known standard as to length of time required for the bubbling procedure to continue in order to determine whether a wine is a certain type, but if the room in which the wine is poured is warm, the wine will effervesce quickly, and if the room is cool and the wine is chilled, the period of effervescence is longer.

Mr. Maglia, on being recalled, stated that he would not agree with the previous witness as to the length of time he and the Government examiner spent in observing how long the wine would sparkle; that in his opinion it was not more than half a minute; and that the warehouse was warm.

In view of the above record, it is evident to the court that although plaintiff's witnesses were well qualified as judges of wines, having served or bought and sold same for long periods of time, their testimony was directed more to showing that Aleatico wine, as they knew it, is a still wine and that wine such as that here involved was not Aleatico wine because of the fact that it effervesced. We are concerned here with the question of whether the wine in question, whatever its name and brand, is a still wine or a petillant or sparkling wine under the internal revenue definitions, above quoted. A determination of that question depends not upon whether a wine known as Aleatico wine is a still wine, but whether the merchandise in suit, in its condition as imported, falls within the definition of a still wine. The evidence discloses that this importation consisted of what is described as a wine which had not been properly aged before being bottled and, as a result, a second fermentation took place causing some of the bottles to break because of the pressure from within and some to burst open. There is no doubt but that it effervesced, and it is clear from the evidence that it was charged with carbon dioxide which resulted from fermentation within a closed container. The fact that a number of the bottles burst because of the pressure from inside would be most

conclusive that the contents consisted not of a still wine but rather a sparkling or petillant wine. It, therefore, falls squarely within the Bureau's definition for sparkling wine and, as such, was properly assessed with internal revenue tax at 15 cents on each half pint under title 26 U. S. C. § 3030 (a) (2), *supra*.

The protest is overruled. Judgment will be rendered accordingly.