(C.D. 2411)

GLAZER'S WHOLESALE DRUG CO., INC. v. UNITED STATES

United States Customs Court, Third Division

(Decided September 23, 1963)

*Sharretts, Paley & Carter (Howard Clare Carter* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Mollie Strum* and *Morris Braverman,* trial attorneys), for the defendant.

Before DONLON, RICHARDSON, and FORD, Judges; RICHARDSON, J., dissenting

DONLON, Judge: The merchandise involved in this case consists of beer, imported from Holland and entered at the port of Houston on June 10, 1957. The entry was liquidated on November 19, 1957, and duty and internal revenue tax assessed. The protest is directed against the collector's failure to demand the return to customs custody of 490 cases under the provisions of section 8.26(a) of the Customs Regulations, on the ground that the merchandise was received in bad order, with labels missing, as required by Regulation No. 7, Internal Revenue Service Code of Federation Regulations, title 27, part 7. It is further claimed that the assessment of duties was illegal and void.

In an amendment to the protest, it is claimed that duties and internal revenue taxes assessed on 490 cases which did not enter the trade and commerce of the United States, by reason of exportation and destruction of the merchandise, should have been remitted, abated, or refunded under section 558(a) (2) of the Tariff Act of 1930, as amended.

Section 8.26(a) of the Customs Regulations provides:

(a) If at any time after entry the collector determines, either from the appraiser's report or otherwise, that any merchandise contained in an importation is for any reason not entitled to admission into the commerce of the United States, he shall promptly demand the return to customs custody of any such merchandise which has been released. * * *

It is clear that even if the merchandise were not entitled to admission into the commerce of the country, the assessment of duties thereon was not illegal and void since, under the present tariff act, duties do accrue upon prohibited merchandise. *Norman G. Jensen, Inc.* v. *United States,* 33 Cust. Ct. 176, C.D. 1650.

Duties and internal revenue taxes may be remitted or refunded where prohibited merchandise is subsequently exported or destroyed in accordance with regulations issued under section 558 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938. Said section reads as follows:

(a) No remission, abatement, refund, or drawback of estimated or liquidated duty shall be allowed because of the exportation or destruction of any merchandise after its release from the custody of the Government, except in the following cases:

*       *       *       *       *       *       *

(2) When prohibited articles have been regularly entered in good faith and are subsequently exported or destroyed pursuant to a law of the United States and under such regulations as the Secretary of the Treasury may prescribe; * * *

*       *       *       *       *       *       *

In order for plaintiff to recover, it must establish by a preponderance of evidence that the merchandise constituted a prohibited article within the meaning of section 558, *supra;* that the collector should have demanded its return to customs custody; and that his failure to do so excused plaintiff from complying with the regulations and entitled it to a refund of the duties paid.

The facts brought out by the record are as follows: The merchandise arrived at the port of Houston on June 7, 1957, and was entered for consumption on June 10, at which time an application for release was filed. The merchandise was released on June 13, 1957, with the notation on the inspector's report that it was in apparent good order, except:

> 1 cs.—13 Bottles Broken—11 Bottles OK
> 2 cs.—24 Bottles Broken in each case
> 1 cs.—4 Bottles Broken—20 Bottles OK

Kenneth Whiting, a clerk employed by Texas Transport & Terminal Co., Inc., steamship agent, testified that he or a representative of his company noticed that the merchandise was damaged the moment they looked into the hatch and discharging commenced. They did not request that the merchandise be destroyed under customs supervision at that time, because they had to get the principal's authority to dispose of the cargo.

Subsequently, and on September 9, 1957, an application was made on customs Form 3499 to "Destroy Goods in bond by breakage, to take place at Holmes Road Dump, 3500 Holmes Rd., Houston, under customs supervision." The merchandise referred to consisted of 490 cases of beer. A letter accompanying the application states that said 490 cases had been damaged in transit and that "the cartons were received in bad shape, crowns are rusty, labels have been wet and damaged, and some of them loosened from the bottles and in the condition as imported it is impossible to put this beer into the commerce of this country."

On September 13, 1957, an application was made on customs Form 4315 for an allowance for damage, loss, or theft of said 490 cases. The damage sustained is described as "Cases waterstained with lables [*sic*] loose and off bottles bottle caps rusted rendering merchandise unsuitable for entry into commerce of U.S.A. to be exported or destroyed under Customs Supervision." The appraiser's report on said application form, dated September 20, 1957, notes: "25% of bottles are damaged due to rusty caps or lables [*sic*] which are loose or soiled due to moisture."

Under date of September 20, 1957, a letter was addressed to the collector by Texas Transport & Terminal Co., Inc., stating that it had been informed at the time of unlading that the cargo had been dam-

aged and that it had ordered the surveyor to take periodic checks at the time of discharge. According to the surveyor's report, dated June 14, 1957, during the voyage, live steam was found to be entering the No. 5 upper tween deck; steam heat had been applied in the process of transferring fuel oil; and a quantity of the general cargo had been affected by condensed steam and water. The report states further that, after discharge in Houston, it was found that 480 cardboard cartons were wet; that there was a quantity of bottles with labels stained or slipping and with metal caps slightly corroded. According to the letter, at the time of delivery, 490 cartons were found to be in bad condition and were rejected by the consignee.

On October 8, 1957, the collector addressed a letter to the broker, stating:

Reference is made to your letter of September 9, 1957, requesting permission to abandon 490 cases of Beer, covered by Houston consumption entry No. 7292–H of June 13, 1957, and thereby obtain allowance in duty and internal revenue tax in the liquidation of the entry.

\*     \*     \*     \*     \*     \*     \*

In view of the fact that none of the regulation requirements, whereby an importer may abandon merchandise and thereby secure abatement of duty and taxes, were met this office must deny your request for abandonment and will liquidate the entry with full duty and tax assessment.

The entry was liquidated on November 19, 1957, and protest filed on January 17, 1958.

In the following October, the 490 cartons were placed on board an outbound vessel and were jettisoned at sea in the Gulf of Mexico on November 2, 1958. As to the arrangements for this action, Mr. Whiting testified:

My superior, Mr. A. B. Clarke, requested me to check with Mr. Voss to see what would be required in the way of removing this cargo from the wharf and disposing of it.

Q. What, if anything, did you do specifically about attempting to secure Customs supervision?—A. I called, talked to Mr. Voss, on 10/23 and asked him what would be required as we had information from our principals in Rotterdam stating to dispose of these cases of beer and bottles at sea. Mr. Voss stated that so far as the Customs were concerned, we would not have to have an inspector in attendance.

Q. Did you specifically request Customs supervision?—A. No, I merely asked him if a Customs inspector would be required when we loaded the cargo on board.

Plaintiff claims that this merchandise was prohibited from or refused entry into the United States; that the collector should have demanded redelivery of the merchandise or accepted its return to customs custody; that his failure to do so excuses compliance with the customs regulations; that the merchandise was, in fact, destroyed

and that, therefore, the plaintiff is entitled to a refund of the duties and taxes collected.

A situation analogous to that in the instant case was involved in *Wm. J. Jones and Co.* v. *United States*, 38 CCPA 158, C.A.D. 453, where it was claimed that, due to a casualty at sea, hops had been contaminated with oil and were unfit for food. Plaintiff contended that as the hops had arrived in an adulterated condition, the importation was prohibited under the pure food laws of the United States and that duties should be refunded, even though the hops had been released from customs custody. This court held and its holding was approved by the court of appeals (p. 162) :

As to the prohibited merchandise claim, there is no evidence before the court that the goods were ever prohibited by any agency of the Government. On the other hand, the evidence shows that no prohibition order was ever issued. The goods were accepted for entry, a delivery permit for consumption was issued by the customs officials, and the sale of the goods had never been prohibited. In all of the cases cited by plaintiff's counsel, the goods had been declared prohibited by a department of the Government and "subsequently exported or destroyed pursuant to a law of the United States under such regulations as the Secretary of the Treasury may prescribe." * * * Therefore the cases cited are not in point. We find no merit in such claim.

In the instant case also, the merchandise has never been denied admission by any Government agency; no prohibition order was ever made; a delivery permit was issued; and the sale of the goods has never been forbidden. A letter, dated February 13, 1958, from the Chief of the Technical Rulings and Services Section, Alcohol and Tobacco Tax Division of the Treasury Department, states that the inspector who investigated the condition of the 490 cases of beer reported that it was not in marketable condition, but adds that there was no provision of the internal revenue law permitting a tax refund nor did the division have authority to direct that the beer be returned to customs custody "since it was legally imported under an approved label." As the label itself was satisfactory, the only violation could be in the fact that some of the labels were loose or soiled. Neither the collector nor the Alcohol and Tobacco Tax Division found that this condition rendered the merchandise inadmissible or made necessary relabeling prior to release.

The situation in *Hulse Import Co.* v. *United States*, 44 Cust. Ct. 243, C.D. 2182, relied on by plaintiff, is quite different. There, the beer was denied admission by the Food and Drug Administration as not being legally marked, since the labels were in the German language. Such labels did not meet the marking requirements of section 304(a) of the Tariff Act of 1930. Subsequently, the merchandise was exported in accordance with section 558(a) of the Tariff Act of 1930 and the applicable customs regulations, and duties were refunded. The question at issue was whether internal revenue taxes should also be re-

funded. None of the pertinent facts in the *Hulse* case is present in the instant case.

Furthermore, it has been held that where Chinese wine was not *per se* inadmissible, but was subject to detention until packed in containers which complied with the internal revenue regulations, it was not prohibited merchandise. *Columbia Co. v. United States*, 9 Cust. Ct. 179, C. D. 688.

There is no evidence in the record here that the beer itself was adulterated or damaged in any way. The most that has been established is that some of the caps were corroded. It may be that beer will spoil if exposed to air, but the record does not show that this beer was so exposed. Whether or not the collector should have recalled the merchandise to determine if it had been harmed during the voyage, plaintiff has not met its burden of proving that the goods, in fact, constituted prohibited merchandise.

Although Mr. Whiting testified that he or a representative from his company had noticed immediately that the merchandise was damaged, he was not asked to describe the damage nor was any other witness called to do so. Since the beer was released to the custody of the plaintiff shortly after its arrival in the United States, plaintiff must have been aware of its condition and should have produced witnesses who could have given the court sufficient information upon which to determine whether the merchandise was so damaged as to constitute prohibited merchandise. This cannot be determined on the basis of inference as to what might or might not have happened to the beer as a result of its subjection to steam and water during the voyage.

Section 8.26 (a) of the Customs Regulations requires the collector to demand the return of merchandise to customs custody, if at any time after entry he determines that it is for any reason not entitled to admission into the commerce of the United States. Since the collector did not demand the return of the instant merchandise, although advised of the damage and the claim that it was "unsuitable" for entry into the commerce of the United States, it is evident that he did not find it inadmissible. The record presented does not establish by a preponderance of the evidence that 490 cases of beer involved herein were so damaged as to constitute prohibited merchandise. Therefore, the collector's failure to demand the return of the merchandise to customs custody was not unwarranted.

Even where merchandise has been refused entry by a Government agency, the importer is not entitled to a refund, unless the requirements of the regulations have been met and the merchandise exported under customs custody. *Norman G. Jensen, Inc. v. United States, supra.* Plaintiff claims, however, that it is excused from complying with the regulations by reason of the collector's failure to demand redelivery of the merchandise, his denial of the application for destruction, and the

customs marine officer's statement that "so far as the Customs were concerned, we would not have to have an inspector in attendance."

It is obvious that the collector's failure to demand the return of the merchandise to customs custody does not excuse compliance with the regulations, since even if he had found it inadmissible, it would still be necessary for it to be exported or destroyed in accordance with the regulations.

It is obvious also that the marine officer's statement does not excuse compliance, since it was not made in connection with a request for customs supervision. Customs supervision could have consisted in something other than the attendance of an inspector. See section 18.7(b) of the regulations, which provides:

(b) The collector shall require only such supervision of the lading for exportation of merchandise covered by an entry or withdrawal for exportation or for transportation and exportation as is reasonably necessary to satisfy him that the merchandise has been laden on the exporting conveyance.

The principal question, therefore, is whether the collector's denial of the applications made to him on customs Forms 3499 and 4315 constituted an excuse for failure to comply with the regulations.

It is to be noted that customs Form 3499 is one for permission to destroy goods in customs custody. According to Customs Regulations, section 15.4, this form is to be used in connection with applications made pursuant to section 563(b) or 557(c) of the Tariff Act of 1930, as amended. These sections refer to the abandonment of merchandise in bonded warehouse or the destruction of merchandise entered under bond. The application on customs Form 4315 is for an allowance for damage, loss, or theft and is directed by the Customs Regulations, section 15.1, to be used in connection with allowances under section 563(a) of the Tariff Act of 1930, as amended, where merchandise is damaged, lost, or stolen while in customs custody, bonded warehouse, the appraiser's stores, or in transportation under bond. None of these sections is applicable to the situation involved herein.

The regulations promulgated in connection with refunds of duties paid on the importation of prohibited merchandise are as follows:

8.49 Entry for exportation; exportation of rejected merchandise. * * *

(b) If merchandise has been regularly entered or withdrawn for consumption in good faith and is thereafter found to be prohibited entry under any law of the United States, it may be exported under customs supervision in accordance with sections 18.25 and 18.26 with refund of any duties that have been paid. * * *

18.25 Direct exportation.—(a) * * * when merchandise which has been entered in good faith is found to be prohibited under any law of the United States, and such merchandise is to be exported directly without transportation to another port, an entry on customs Form 7512 shall be filed in quadruplicate. * * *

(b) An exportation bond on customs Form 7557, 7559, or other appropriate form shall be required with the entry, provided a consumption entry bond on customs Form 7551 or 7553 or other appropriate form was not previously given. * * *

(c) If the merchandise has been landed or is transferred from one vessel to another and has been entered for consumption or, in the case of goods entered for consumption and rejected, if the statistical copy of the consumption entry has not been sent to the New York Office, Foreign Trade Division, Bureau of the Census, commerce Form 7513 shall be used as the export declaration.

So far as the record shows, no attempt was made to comply with these regulations. Denial of applications made under certain inappropriate sections of the tariff act and the regulations issued thereunder does not constitute a valid excuse for failure to comply, or tender compliance, with the regulations issued under the section of the tariff act under which claim for allowance in duties is made.

It is to be noted, further, that no effort was made to abandon the merchandise within 30 days after release under section 506(1) of the Tariff Act of 1930. According to the testimony and the letter of Texas Transport & Terminal Co., Inc., the damage was discovered as the merchandise was being discharged from the vessel. Mr. Whiting stated that it was not then destroyed, because authority from the principal had to be obtained. Certainly, it would have been possible to communicate with the principal in Rotterdam and receive a reply within 30 days. Instead, nothing was done to abandon, export, or destroy the merchandise until September, more than 3 months after its arrival, and then inapplicable forms were used. The merchandise was not, in fact, destroyed until 1 year and 5 months after arrival and almost 1 year after liquidation. Apparently, this was due to pending claims for damages. A letter, dated October 27, 1958, from Texas Transport & Terminal Co., Inc., to the captain of the vessel from which the merchandise was finally jettisoned (plaintiff's collective exhibit 1), states:

This will serve to advise that during the subject vessel's arrival at this port on June 7, 1957, the above mentioned shipment was damaged due to a broken steam pipe in the #5 UTD Portside AFT with the results that the Consignee rejected 490 cartons of beer. This damaged portion has been maintained in our possession pending final settlement of the claim presented.

We received instructions from Holland America Line, Claims Division, New York, to dispose of the 490 cartons the best way we see fit since a satisfactory settlement has been reached.

In view of these circumstances, plaintiff's failure to comply with the regulations issued under section 558(a) (2), *supra*, is not excused. Thus, even if the merchandise be deemed prohibited, plaintiff is not entitled to recover.

For the reasons stated, the protest is overruled. Judgment will be rendered for the defendant.

DISSENTING OPINION

RICHARDSON, Judge: I would sustain the protest. The evidence indicates that, at the time the subject merchandise was landed, the 490 cases of beer in question, or some quantity contained therein, were damaged externally to an extent which rendered them unfit for commercial channels. In its landed condition, the subject merchandise has been variously described at divers times. The cargo surveyor's report described the merchandise as "480 cdbd ctns wet, quantity of bottles with labels stained, slipping metal caps corroded slight." In a report to the collector, the appraiser described the merchandise as "25% of bottles are damaged due to rusty caps or lables [sic] which are loose or soiled due to moisture." And the Regional Commissioner of Internal Revenue described the merchandise as "not in a marketable condition," although he felt hampered by some procedural impasse concerning the consignee's remedy for relief, due to the fact that the merchandise had been released from customs custody.

In such condition, the merchandise never left the docks. It was rejected outright by the consignee upon inspection, and an application was filed with the collector at the port of entry for exportation or destruction under customs supervision. And until the merchandise was actually exported and destroyed, it remained in the custody of the steamship agent in a shed on the docks.

This state of facts brought the merchandise within the class of prohibited articles referred to in 19 U.S.C.A., section 1558(a)(2) (section 558(a)(2), Tariff Act of 1930) and entitled the consignee to an abatement or refund of duties. There is sufficient evidence of record of the deterioration of the containers in which the subject beer was imported to bring the affected merchandise within the condemnation of at least two laws of the United States. As an alcoholic beverage, the importation at bar was subject to the requirements of the Federal Alcohol Administration Act, which prohibits the mutilation, destruction, obliteration, or removal of any mark, brand, or label upon malt beverages held for sale in interstate or foreign commerce or after shipment therein, except under certain conditions not here applicable.[1] The mishap to which the involved beer was subjected at sea brings the affected articles clearly within the purview of this statute. As used in laws prohibiting adulteration, food is generally held to mean any article used as food or drink. Consequently, the damaged condition of the containers holding the subject beer is deemed to be adulterated under the Food, Drug & Cosmetic Act, since it was held under insanitary conditions whereby it may have been contaminated with filth, and where its container is composed in part of any deleterious substance

---

[1] 27 U.S.C.A., § 205.

which may render the contents injurious to health.[2]   Food so adulterated is not entitled to admission into the commerce of the United States.   The subject merchandise falls within the condemnation of this statute also.

The majority would deny relief to the consignee under section 1558 (a)(2), *supra*, following the case of *Wm. J. Jones and Co.* v. *United States*, 38 CCPA 158, C.A.D. 453, because the beer in question had never been denied admission by any Government agency, nor had any prohibitory order been made against such merchandise.   In my opinion, there are considerable differences between the instant case and the *Jones* case.   In the *Jones* case, there was no evidence as to actual damage on board ship; and the ship's officer conjectured about a possible oil leak and no further evidence was adduced relative to the condition at the time of unlading.   Moreover, in the *Jones* case, the merchandise had moved inland for some distance before the claimed damage was ascertained.   In the instant case, the ship's officer definitely reported damage to 480 cases of beer on board ship; and the merchandise remained at the docks.   In the *Jones* case, no agency of the Government expressed an opinion as to the unfitness of the merchandise for commercial channels, while in the case before us, the internal revenue inspector reported that the 490 cases in question were not in a marketable condition at the time of unlading.   In the *Jones* case, the importer's application for destruction of the merchandise was at least acted upon by the collector.   However, in the instant case, and contrary to the assumption made by the majority, the consignee's application for destruction of the merchandise under customs supervision was not acted upon by the collector.

There is nothing in section 1558(a)(2), *supra*, which delegates *exclusive* responsibility for ascertaining whether or not imported merchandise is "prohibited" to any administrative agency of the Government.   And, in the absence of such express statutory reservation, the courts are privileged to and should interpret a statute and define its application to the facts developed in the evidence.   *Kirschbaum Co.* v. *Walling*, 316 U.S. 517; *Skidmore* v. *Swift & Co.*, 323 U.S. 134. Under section 1558(a)(2), *supra*, the court must make its own findings as to whether or not merchandise is "prohibited" independent of administrative action.   *Kreutz & Co.* v. *United States*, 20 CCPA 109, T.D. 45752.   The principal inquiry to be made under this statute is whether the subject merchandise is "prohibited" *under the law*, and not whether such merchandise has been "prohibited" by *an administrative agency* of the Government.   *Kreutz & Co.* v. *United States*, *supra*.

The inherent danger of relying solely on administrative action as a basis for interpreting and applying section 1558(a)(2), *supra*, is

---

[2] 21 U.S.C.A., § 342.

illustrated in an observation made by our court of appeals in *United States* v. *W. F. Mackay*, 34 CCPA 127, 133, C.A.D. 355, concerning the functions of a typical administrative agency concerned with imported merchandise, namely, the Food and Drug Administration. In that case, the court pointed out that the Food and Drug Administration does not furnish inspectors at each port of entry and relies upon customs personnel to furnish samples of imported merchandise for examination. Hence, where, as in the instant case, customs personnel have declined or failed to supply such samples to the Food and Drug Administration, either before or after releasing the merchandise to the consignee, there could be no basis for such administrative action. Thus, the mandate of section 1558(a)(2), *supra*, is emasculated through Government inaction. Such a result does not comport with congressional intent, as expressed in the language of this statute. The language of section 1558(a)(2), *supra*, does not foreclose the situation where "prohibited" merchandise escapes customs surveillance and is detected only after the merchandise has been released to the importer. Such is the posture of the instant case.

It is incumbent upon collectors, as well as the courts, to apply the provisions of section 1558(a)(2), *supra*, in appropriate cases. The collector at bar recognized his responsibility under this statute to make inquiry subsequent to the release of the merchandise to the consignee. He received the consignee's application for destruction of the merchandise on forms modified to meet the exigencies of the occasion, engaged the time and effort of the appraiser to ascertain the extent of damage, received a report of the occurrence which occasioned the damage from the shipper and referred it promptly to the appraiser, and received the appraiser's report of the estimated damage to the merchandise in question.

At this point, the collector's efforts went awry. In transmitting the application from the subport at Houston to the headquarters port at Galveston, a clerk in the entry division erroneously characterized the application in a memorandum note, dated October 2, 1957, as follows:

Attached please find complete file on the above mentioned entry in which the importer wishes to abandon 490 cases beer for destruction. Entry mailed to your office for liquidation on Sept. 12, 1957. Please advise of your decision.

The collector at Galveston, apparently of the opinion that the consignee sought relief under the abandonment statute,[3] declined to abate the duties and taxes paid on the beer in question because, as he stated in his letter to the broker, under date of October 8, 1957, ". . . none of the regulation requirements, whereby an importer may abandon

---

[3] 19 U.S.C.A., § 1506(1).

merchandise and thereby secure abatement of duty and taxes, were met . . . ." Thus, it clearly appears in the record that the consignee's application for destruction of the imported merchandise under customs supervision went begging for disposition by the collector, because the consignee fell victim to the mistaken belief entertained by the collector concerning the nature of the relief sought. At the time the consignee sought relief, abandonment of the subject merchandise was no longer available to it, but the exportation or destruction of such merchandise in customs custody or under customs supervision was still available to the consignee. As such, it is no answer to the claim here made for the majority to conclude that the collector's refusal to resume custody of the subject merchandise must be regarded as a finding that the collector found the merchandise not to be "prohibited" merchandise under section 1558(a)(2), *supra*, when, in fact, he did not pass upon that issue at all, as the record reveals.

The majority have seemingly invoked the doctrine of "laches" against the plaintiff, noting that its application was made more than 3 months after the subject merchandise was released from customs custody. I find nothing in the record which impugns the good faith of the plaintiff consignee in the filing of its application, or which indicates its awareness of facts bearing upon the condition of the beer prior to its release. The steamship agent to whom the knowledge of the damaged condition of the beer upon arrivel was first imparted, and in whose custody the beer was kept on the docks, was the agent of the ocean carrier and appears to have responded only to instructions from its principal abroad. It should be borne in mind that this beer was sold to the plaintiff consignee while in transit under a bill of lading made out to the importer, Van Munching & Co., Inc., of New York City. Consequently, arrangements for the transportation, handling, and destination of this merchandise had been set even before the plaintiff came into the picture. Under such circumstances, it is unlikely that the plaintiff could have figured more prominently than it did in the disposition and settlement of the damaged beer problem. In the filing of the instant application, the plaintiff acted seasonably in its own best interests after its initial inspection and rejection of the subject merchandise on the docks.

Beer enjoys an inseverable relationship to its container, by reason of the oxidation spoilage to which it is subject, so that injury or damage to the container is tantamount to injury or damage to the beverage itself. It is this quality which sets beer apart from other alcoholic beverages not so affected by oxidation spoilage. On such basis, the instant case and the *Hulse* case are distinguishable from *Columbia Co.* v. *United States*, 9 Cust. Ct. 179, C.D. 688, cited by the majority opinion,

wherein importations of Chinese wine were not regarded by the court as being "prohibited articles" solely because of defective containers.

Even if internal examination of the beer is necessary or desirable under section 1558(a) (2), *supra*, the critical time for the marshaling of such evidence was not at trial time, but at the time when the merchandise was in the carrier's custody on the docks and the Government's inspection was invited. Nothing testified to at trial time could improve upon the quantum of evidence available at the time of dock storage.

There were extraordinary circumstances attendant upon the landing of the involved merchandise which warranted a more thorough examination of such merchandise than it received. Even the breakage noted by the discharging inspector upon the release of the beer from customs custody forebode more, under the circumstances, than the customary hazards of an ocean voyage and handling of merchandise in transit. *Cf. Italerica Corporation* v. *United States*, 28 Cust. Ct. 259, C.D. 1419. It is not unlikely that a thermal processing of the beer in a bath of steam during the voyage of importation would have left its mark upon the beer—causing a secondary fermentation of the beer in the bottles, a resultant increase in carbon dioxide pressure, and consequent breakage of bottles from such added pressure.[4] In any event, the collector was not obliged to speculate about the condition of the beer, as we must of necessity, do now. He twice had opportunity to procure appropriate examinations and analyses of samples of the affected beer and declined or failed to do so.

Under the circumstances of this record, it is deemed sufficient that the merchandise was, in fact, exported and destroyed. In no uncertain terms, the plaintiff had requested in its application to the collector the destruction of this beer under customs supervision and had been turned down albeit for mistaken reasons. Beyond making such a request, there remained nothing further that it could do to effectuate the customs supervised disposal of the merchandise. The fact that exportation and destruction of such merchandise took place outside of customs supervision cannot be attributed to any dereliction on the part of the plaintiff-consignee. The default lies with the collector, however much it appears that he misunderstood the claim made. Nevertheless, the failure of the collector to discharge antecedent obligations accruing under section 1558(a)(2), *supra*, should not operate to deprive the plaintiff of rights obtainable thereunder. *Bacardi Corporation* v. *United States*, 11 Ct. Cust. Appls. 252, T.D. 39078; *Armour and Company* v. *United States*, 29 Cust. Ct. 296, C.D. 1482.

For the reasons stated, I would, therefore, sustain the instant protest.

---

[4] Parker, Harvey & Stateler, Elements of Food Engineering, *ibid.*